JASON M. PARKER,

                Plaintiff,             CASE NO. 17-CV-935

v.

C.O. KNECHT, C.O. SHELBY,
C.O. MARTINI, UNKNOWN NURSE (KCCHS),
and C.O. HOLTERMAN,

                Defendants.

## DEFENDANTS' BRIEF IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT

Defendants Knecht, Shelby and Holterman, by their attorneys, MUNICIPAL LAW & LITIGATION GROUP, S.C., file this Brief in Support of their Motion for Summary Judgment.

## INTRODUCTION

Jason M. Parker (hereinafter "Parker") alleges that officers at the Kenosha County Pre-Trial Facility violated his constitutional rights by failing to provide him with adequate medical care. However, Parker failed to exhaust his administrative remedies with respect to his claims as required under the Prison Litigation Reform Act, 42 U.S.C. § 1997e(a). Moreover, Parker cannot prove deliberate indifference on the part of any of the named officers. Parker cannot show personal involvement on the part of the individual officers, or that any of the officers involved acted with deliberate indifference or objectively unreasonable toward his medical needs. The Defendants are also entitled to qualified immunity. Accordingly, Parker's Complaint should be dismissed in its entirety.

1

## FACTUAL BACKGROUND

Parker's Complaint stems from an incident he alleges occurred on April 4, 2017 at Kenosha County Pre-Trial Facility. (DFOF ¶ 8.) At that time, Parker had had his probation revoked in Kenosha County Case No. 2016CM1475 and was serving a nine-month sentence. (DFOF ¶ 9.)[1] Additionally, Parker was pending charges in Case No. 2017CM144. (DFOF ¶ 10.)[2]

### I. KENOSHA COUNTY PRE-TRIAL FACILITY POLICIES

#### a. Medical Request Policy

During the events at issue in this lawsuit, Kenosha County Detention Center had policies and procedures in place that governed inmate medical requests. (DFOF ¶ 11.) Under policy PTF SOP/ 01-2012, when an inmate requires routine medical, dental or psychological care the inmate communicates his/her medical request to medical staff through a Medical Request Form. (DFOF ¶ 12.) Medical Request Forms are then picked up by officers as they become available during rounds and placed into the Health Services Unit basket. (DFOF ¶ 13.)

Health Services staff will then "review Medical Request Forms and address the necessary medical and dental concerns. HSU staff will determine if the inmate will be seen as a result of the information supplied on the form and if so, the timetable for the appointment."  (DFOF ¶ 14.)

---

[1] Kenosha County Case No. 2016CM1475 was filed on November 11, 2016. Parker was charged with battery - domestic abuse, disorderly conduct – domestic abuse, and obstructing an officer. On December 14, 2016 Parker plead guilty to obstructing and officer and was sentenced to probation – one year withheld. On March 3, 2017 Parker's probation was revoked and he was sentenced to nine months in jail.

[2] Kenosha County Case No. 2017CM144 was filed on February 2, 2017. Parker was charged with disorderly conduct – domestic abuse and criminal damage to property – domestic abuse. On May 25, 2017 Parker plead guilty to both charges and was sentenced to 120 days in jail, concurrent with 14CM1475.

### b. Grievance Policy

During the events at issue in this lawsuit, Kenosha County Pre-Trial Facility had policies and procedures in place governing inmate grievances. (DFOF ¶ 15.) Policy PTF SOP/06-2010 stated, in part:

> Inmate/detainees in the Pretrial Facility (PTF) may use the established grievance process to secure equitable and timely responses and/or solutions to legitimate grievances. They will not be penalized for using the procedure except that lying about a staff member or service provider is a rules violation and will be treated accordingly. The grievance procedure will not be used for matters of discipline, which has a separate appeal process. Translating and/or additional assistance shall be provided upon request.

(DFOF ¶ 16.)

The procedure for inmates to file a grievance begins with the inmate first speaking to a correctional officer and orally presenting the issue of concern. This is referred to as an oral grievance. (DFOF ¶ 17.)  If the officer is unable to resolve the issue, the inmate may then obtain an Inmate Grievance Form from his/her Zone officer and return the form to the Zone officer. (DFOF ¶ 18.) The grievance will then be forwarded to a supervisor for review and returned to the inmate. If an inmate is dissatisfied with the response, the inmate has 72 hours to file an appeal with the Facility Administrator or his/her designee. (DFOF ¶ 19.)  The Facility Administrator will assemble an Appeals Committee consisting of three persons and that committee will determine the final appeal. (DFOF ¶ 20.)

A log is maintained by the Office Associate in PTF Administration. The log electronically documents inmate/detainee grievances. (DFOF ¶ 21.)  A copy of the inmate/detainee grievance policy is provided in the Kenosha County Pre-Trial Facility Inmate Handbook. (DFOF ¶ 22.)

### c. Parker's Use Of The Grievance System.

Parker was aware of and regularly utilized the inmate grievance system during his incarceration at Kenosha County Pre-Trial Facility. (DFOF ¶ 23.) Parker cannot recall if he exhausted the grievance system with respect to these claims. (DFOF ¶ 24.)

Kenosha County records show that Parker filed one grievance with respect to the allegations in this lawsuit: on April 9, 2017 Parker filed a grievance alleging that on either April 4, 5, or 6: "I asked the dorm officer could I go to medical the officer replied to me saying "'I'm busy right now.'" (DFOF ¶ 25.)

On April 10, 2017, Parker received a grievance response stating that his complaint was unfounded and then he needed to follow proper procedure to receive medical care. (DFOF ¶ 26.) Parker did not appeal this grievance response nor did he submit any additional grievances with respect to the underlying facts and circumstances of this case. (DFOF ¶ 27.)

## II. Parker's Skin Itch

Parker alleges that his skin began to itch in February of 2017 while he was incarcerated at the Kenosha County Pre-Trial facility. (DFOF ¶ 28.) Parker believes he started itching after his cellmate also began to itch. (DFOF ¶ 29.) To his knowledge, Parker's cellmate was never medically diagnosed regarding the itching, despite being seen by medical staff. (DFOF ¶ 30.)

Parker sought treatment from jail medical staff for his itching. (DFOF ¶ 31.) Parker believes he had scabies – but he was never diagnosed with scabies by any of the medical staff he saw at Kenosha County Pre-Trial Facility. (DFOF ¶ 32.) Parker is not an expert on scabies and has no medical training or background. (DFOF ¶ 33.) He admits that every time he filled out a medical request form, he received a response from the medical staff. (DFOF ¶ 34.)

Parker's received ongoing and appropriate medical treatment for itching while at Kenosha County Pre-Trial Facility for an itch/rash as needed from February 2017 until May 2017. (DFOF ¶ 35.)

### III. Phone Calls From Parker's Family

Parker alleges that on April 4, 2017 his mother or his aunt called the Kenosha County Pre-Trial Facility. (DFOF ¶ 36.) Indeed, his aunt called Kenosha County sometime in April 2017 to report to Jail staff that Parker continued to itch. (DFOF ¶ 37.) Parker's aunt decided to make this call after learning from Parker's mother that Parker was itching and that medical staff had only provided him with Benadryl – which was not relieving the itch. (DFOF ¶ 38.) During her phone call in April 2017, Parker's aunt was told that her report would investigated and that Parker could request to see medical staff on his own, if necessary. (DFOF ¶ 39.) At no point during this phone call was Parker's aunt told that Parker should speak to a correctional officer about his itching or to tell a correctional officer that medical staff told a family member that he needed to be seen immediately. (DFOF ¶ 40.)

At no time did Parker's aunt speak directly with Parker about his itching or about her phone call with jail staff. (DFOF ¶ 41.) All communication between Parker's aunt and him was done through Parker's mother. (DFOF ¶ 42.) Parker's aunt called the Kenosha County Pre-Trial Facility on three occasions during his incarceration (twice for his itching and once for an unrelated event) but never spoke to Officers Holterman, Knecht, Shelby, or Martini, or to any of the jail medical staff. (DFOF ¶ 43.)

Parker's mother alleges that at some point in time she also called the jail's "front desk" and informed the person who answered the phone that Parker was itching. (DFOF ¶ 44.) She does not know when she called or who she spoke to. (DFOF ¶ 45.) However, she recalls that the person she

spoke to told her that Parker should fill out a medical request form and return it to his dorm officer. (DFOF ¶ 46.) Parker's mother was never told by a nurse at Kenosha County Jail that Parker should speak to a correctional officer about his itching or to tell a correctional officer that medical staff told a family member that he needed to be seen immediately. (DFOF ¶ 47.)

Parker admits that it is not normal procedure to request medical care by having an outside family member call the jail on an inmate's behalf. (DFOF ¶ 48.)

## IV.     April 4, 2017 Allegations Against Individual Defendants

On April 4, 2017 at approximately 6:30 p.m., Parker reported to Officer Knecht that he needed to go to medical. (DFOF ¶ 49.) He told Officer Knecht that his family had called and that he needed to go to medical. (DFOF ¶ 50.) Parker does not recall how Officer Knecht responded:

Q:      …Did you complain to CO Knecht about being itchy?

A:      Yes.

Q:      And what did you say to him?

A:      "My family called up here. I'm itching. I need to get to medical." He knew what was going on.

Q:      And what did he say to you?

A:      I don't recall.

(DFOF ¶ 51.) Officer Knecht recalls telling Parker that he needed to fill out an inmate medical request form if he wanted to be seen by medical – as per the facility's policy. (DFOF ¶ 52.)

Parker alleges he also reported to Officer Holterman that his family had called the jail and that he needed to be seen by medical immediately. (DFOF ¶ 53.) Parker alleges that he told Officer Holterman that he needed to go to medical, but, again, he does not recall if or how Officer Holterman responded to him:

Q:      What did you tell CO Holterman?

A:      I need to get to medical, I'm itching.

Q:      And what did he say?

A:      He knew it. He was my dorm officer.

Q:      Did he respond to you verbally?

A:      I can't recall what they said. They got cameras in there. You can see me
        talking to him.

(DFOF ¶ 54.) Parker admits that Officer Holterman never told him that he would not take Parker

to medical. (DFOF ¶ 55.)[3]

Parker does not recall whether he complained to Officer Shelby about needing medical

care. (DFOF ¶ 57.) Parker cannot recall what, if anything, he said to Officer Shelby or if and how

Officer Shelby responded.

Q:      Did you complain to CO Shelby that you were itching?

A:      Yes. He was right there.

Q:      Did you complain directly to him?

A:      I can't recall. I can look at my paperwork. I write down everything. I just
        don't want to say nothing –

Q:      What did you say to him?

A:      I don't recall what I said to him.

Q:      Can you recall how he responded to you?

A:      Who are you talking about?

Q:      Shelby.

A:      I can't recall. There were cameras.

---

[3] Indeed, Parker testified that he never even wanted to bring Officer Holterman into this lawsuit, except that the form
complaint he received for his lawsuit asked him to name everyone "who had something to do with [his allegation]"
and Parker believed that he **had** to name Officer Holterman.  (DFOF ¶ 56.)

(DFOF ¶ 58.)

Parker alleges that his "complaints" to Officers Knecht, Holterman and Shelby occurred around 6:30 p.m. (DFOF ¶ 59.) Less than an hour later, at 7:25 p.m., a nurse came through Parker's cellblock with Officer Martini. (DFOF ¶ 60.) Officer Martini was assisting the nurse in a medpass. (DFOF ¶ 61.) Parker cannot recall whether he told Officer Martini or the nurse that he wanted medical attention:

> Q:     As we sit here today, you can't recall whether you told the nurse or whether you told CO Martini that you were itching?
>
> A:     I know I was standing right there.
>
> Q:     But you can't recall if you spoke with them?
>
> A:     I might have told them. I might have. I can't recall.

(DFOF ¶ 62.)

As a medical escort, Officer Martini's responsibility during medpass was to assist in passing out medications to inmates by properly identifying inmates and ensuring the safety and security of medical staff. (DFOF ¶ 64.) Parker understands this. (DFOF ¶ 65.) Moreover, any medical questions posed by inmates during a medpass are directed to medical staff. (DFOF ¶ 66.) Parker admits that the nurse who came through for medpass did not believe that he needed immediate medical treatment. (DFOF ¶ 66.)

Parker also understands that inmates seeking medical care at the Kenosha County Pre-Trial Facility "must submit a request on the proper form prior to ten p.m. the night before." (DFOF ¶ 67.) He further admits that he utilized the medical request procedures on multiple occasions. (DFOF ¶ 68.) Indeed, nowhere in the Inmate Handbook does it direct an inmate to request medical attention by having an outside family member call jail administration. (DFOF ¶ 71.)

8

Parker understands that if an inmate is unhappy with the medical care he is receiving at the jail, the next step is to file a grievance with the jail and, if necessary, to file an appeal. (DFOF ¶ 69.) Parker cannot recall if he filed grievances against the named defendants in this case regarding his medical care complaints. (DFOF ¶ 70.)

On April 4, 2017, Parker filled out an inmate medical request form. (DFOF ¶ 72.) He was seen by medical staff the following day, where a nurse spoke to him about the possibility that his itching may be caused by laundry detergent. (DFOF ¶ 73.)

Parker last sought treatment for itching by Kenosha County medical staff in May 2017. (DFOF ¶ 74.) He is unsure if he requested medical treatment from May 2017 through his release in October 2017. (DFOF ¶ 75.) He was released from Kenosha County Pre-Trial Facility on October 6, 2017. (DFOF ¶ 76.) Parker did not seek outside medical attention for the itching until April 3, 2018. (DFOF ¶ 77.) Parker does not believe he has scabies on his body any longer. (DFOF ¶ 78.)

Neither Officers Knecht, Holterman, Shelby, nor Martini have medical training beyond basic first aid and basic CPR. (DFOF ¶ 63.)

## SUMMARY JUDGMENT STANDARD

Federal Rule of Civil Procedure 56(c) provides that summary judgment should be granted if the evidence offered demonstrates that "there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law." *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 250 (1986).

The initial burden is on the moving party to demonstrate, with or without supporting affidavits, the absence of a genuine issue of material fact and that judgment as a matter of law should be granted to the movant. *Id*. at 322. To defeat summary judgment, parties must produce

specific material facts in support of their claims sufficient to sustain their burden at trial. *Id.* at 324. The plaintiff cannot rest on the pleadings, but must demonstrate the existence of sufficient evidence that if believed by a jury, would support a verdict in his or her favor. *Jelinak v. Greer*, 90 F.3d 242, 243-44 (7th Cir. 1996). Absent a showing that a defendant may be liable, the defendant should not be required to undergo the considerable expense of preparing for and participating in trial. *Anderson*, 477 U.S. at 256-57.

In ruling on a motion for summary judgment, the district court's role is to determine whether there is a genuine dispute as to a fact that is material and outcome determinative. *See Vasquez v. Hernandez*, 60 F.3d 325, 328 (7th Cir. 1995). The requirement is that there be a genuine issue of material fact. *Anderson*, 477 U.S. at 248; *see also Fitzpatrick v. Catholic Bishop of Chicago*, 916 F.2d 1254, 1256 (7th Cir. 1990) ("The days are gone, if they ever existed, when the nonmoving party could sit back and simply poke holes in the moving party's summary judgment motion.") The court, faced with a summary judgment motion, must decide whether the state of the evidence is such that, if the case were tried tomorrow, the plaintiff would have a fair chance of obtaining a verdict. If not, the motion must be granted and the case dismissed. *Palucki v. Sears Roebuck & Co.*, 879 F.2d 1568, 1572-73 (7th Cir. 1989).

<u>**ARGUMENT**</u>

**I.    PARKER DID NOT EXHAUST HIS ADMINISTRATIVE REMEDIES.**

"There is no question that exhaustion is mandatory under the PLRA and that unexhausted claims cannot be brought in court." *Jones v. Bock*, 539 U.S. 199, 211 (2007). The Prison Litigation Reform Act (PLRA), 42 U.S.C. § 1997e(a), provides, in relevant part: "No action shall be brought with respect to prison conditions under [42 U.S.C. § 1983], or any other Federal law, by a prisoner confined in any jail or prison, or other correctional facility **until such administrative remedies**

**as are available are exhausted**." (emphasis added). Prisoners are required to exhaust all available administrative remedies at a correctional facility before they can file a lawsuit alleging § 1983 claims. *Santiago v. Ware*, 205 Wis. 2d 295 (Ct. App. 1996); *Perez v. Wis. Dep't of Corrs.*, 182 F.3d 532 (7th Cir. 1999); *State ex rel. Ledford v. Cir. Ct. for Dane Cnty.*, 228 Wis. 2d 768 (Ct. App. 1999); *Owens v. Hinsley*, 635 F.3d 950 (7th Cir. 2011). The PLRA exhaustion requirement applies whenever an individual is incarcerated at the time he files suit. *Kerr v. Puckett*, 138 F.3d 321, 323 (7th Cir. 1998).

The exhaustion requirement serves two purposes: <u>First</u>, it gives prison officials the chance to address prisoner's claims before any litigation becomes necessary. *Kaba v. Stepp*, 458 F.3d 678, 684 (7th Cir. 2006.) <u>Second</u>, it "seeks to reduce the quantity and improve the quality of prisoner suits." *Porter v. Nussle*, 534 U.S. 516, 524 (2002).

Since its enactment in 1996, the Supreme Court has referred to the exhaustion requirement as a "centerpiece" of the PLRA. *Woodford v. Ngo*, 548 U.S. 81, 84 (2006). The PLRA "invigorated" the exhaustion provisions of previous legislation regarding prisoner litigation. *Porter v. Nussle*, 534 U.S. 516, 524 (2002). Under the PLRA's more stringent requirements, "[e]xhaustion is no longer left to the discretion of the district court, but is mandatory." *Woodford*, 548 U.S. at 85. Indeed, the Supreme Court even declined to allow for a "special circumstances" exception to the exhaustion requirement given the PLRA's mandatory language:

> But aside from [the remedies being "available"], the PLRA's text suggests no limits to an inmate's obligation to exhaust – irrespective of any "special circumstances."
>
> And that mandatory language means a court may not excuse a failure to exhaust, even to take such circumstances into account. No doubt, judge-made exhaustion doctrines, even if flatly stated at first, remain amenable to judge-made exceptions. But a statutory exhaustion provision stands on a different footing. There, Congress sets the rules—and courts have a role in creating exceptions only if Congress wants them to. For that reason, mandatory exhaustion statutes like the PLRA establish mandatory exhaustion regimes, foreclosing judicial discretion. Time and again, this

Court has taken such statutes at face value—refusing to add unwritten limits onto their rigorous textual requirements. See, *e.g., id.,* at 111, 113 S.Ct. 1980; *Shalala v. Illinois Council on Long Term Care, Inc.*, 529 U.S. 1, 12–14, 120 S.Ct. 1084, 146 L.Ed.2d 1 (2000); see also 2 R. Pierce, Administrative Law Treatise § 15.3, p. 1241 (5th ed. 2010) (collecting cases).

*Ross v. Blake*, 136 S.Ct. 1850, 1865-57 (2016) (internal citations omitted).

Under the PLRA, inmates must exhaust remedies pursuant to the specific correctional facility's rules and procedures: "To exhaust remedies, a prisoner must file complaints in the place, and at the time, the prison's administrative rules require." *Pozo v. McCaughtry*, 286 F.3d 1022, 1025 (7th Cir. 2002). To comply with § 1997e(a), a prisoner must "properly take each step within the administrative process." *Pozo v. McCaughtry*, 286 F.3d 1022, 1025 (7th Cir. 2002). The PLRA mandates exhaustion "regardless of the relief offered through administrative procedures." *Booth v. Churner,* 532 U.S. 731, 741 (2001). This includes following instructions for filing the initial grievance, *Cannon v. Washington*, 418 F.3d 714, 718 (7th Cir. 2005), as well as filing all necessary appeals, *Burrell v. Powers*, 431 F.3d 282, 284-85 (7th Cir. 2005), in the place, and at the time, the prison's administrative rules require, *Pozo*, 286 F.3d at 1025.

"Section 1997e(a) says that exhaustion **must proceed litigation**." *Ford v. Johnson*, 362 F.3d 395, 398 (2004) (emphasis added). A lawsuit is "brought" for the purposes of § 1997e(a) when the prisoner's complaint is mailed to the court. *Id*. at 399 (holding that plaintiff "jumped the gun" by mailing/filing a complaint/lawsuit before receiving a decision regarding his grievance and, in doing so, noted that plaintiff "thought that mailing the complaint to the court was enough to bring suit; we hold that, for purposes of § 1997e(a), it was.").

Under the requirements set forth in the PLRA and the above authorities, Parker did not exhaust his administrative remedies here. Parker alleges that the named officers were deliberately indifferent to his medical needs. (*See generally*, Doc. 1, Compl.) However, Parker failed to exhaust

his administrative remedies prior to bringing this lawsuit and, therefore, his Complaint should be dismissed in its entirety. *See Porter v. Nussle,* 534 U.S. 516, 524 (2002) (exhaustion is required in all actions brought with respect to prison conditions); *see also Lilly v. Ozmint*, Case No. 2:07-1700, 2007 WL 2021874 *2 (D. S.C. July 6, 2007) ("Just as payment of one fee does not cover multiple plaintiffs under the PLRA, exhaustion of administrative remedies by one prisoner does not meet the exhaustion requirement for all the plaintiffs. Each individual plaintiff is required to comply with the exhaustion requirement.").

Despite understanding the Kenosha County Pre-Facility's grievance procedures, Parker only filed one grievance that could – given a generous interpretation – be related to the underlying claims in this lawsuit. It is unclear whether the grievance itself was even in regard to the underlying facts in this lawsuit. Parker failed to provide sufficient detail in the grievance to put the jail on notice of the particular claims in the lawsuit – i.e. the grievance does not have a specific date (Parker alleges the event occurred on either April 4, 5, OR 6), it does not provide the name of the corrections officer that Parker spoke to, and the facts stated in the grievance (that a corrections officer told him "I'm busy right now") do not line up with the facts and circumstances of this lawsuit. Regardless, when that grievance was deemed unsubstantiated, Parker did not appeal the decision – thus, he did not exhaust his administrative remedies.

Rather than exhaust the grievance procedures, Parker "jumped the gun" and moved straight to filing this lawsuit in federal court. This runs directly contrary to the PLRA's requirement that "no action shall be brought . . . **until such administrative remedies are exhausted**." 42 U.S.C. § 1997e(a) (emphasis added). Thus, because Parker did not timely exhaust his administrative remedies, his Complaint should be dismissed in its entirety.

## II.     OFFICERS SHELBY AND MARTINI LACK PERSONAL INVOLVEMENT.

Personal involvement is a prerequisite for individual liability in a civil rights action – a defendant must have caused or participated in an alleged constitutional deprivation to incur liability. *Wolf-Lillie v. Sonquist*, 699 F.2d 864, 869 (7th Cir. 1988). Here, Parker's claims against Officers Shelby and Martini should be dismissed for lack of personal involvement.

There is no evidence that Officers Shelby and Martini were even aware that he was requesting medical care. Parker admits that he cannot recall whether he told Officer Shelby or Officer Martini whether he was itching. He also cannot recall if or how either officer may have responded to him. Accordingly, both Officers Shelby and Martini should be dismissed.

## III.     THE OFFICERS DID NOT ACT WITH DELIBERATE INDIFFERENCE.

It is well established that when it comes to medical care in a prison setting, "prisoner[s] [are] not entitled to receive unqualified access to healthcare.' *Holloway v. Delaware Cnty. Sheriff*, 700 F.3d 1063, 1073 (7th Cir. 2012) (citations omitted). Rather, "prisoners are entitled only to adequate medical care." *Id*.

Although the Court allowed Parker's claims to proceed under the Fourteenth Amendment, Parker's custodial status –the constitutional provisions that govern his claims – may be those of a prisoner serving a sentence who is protected under the Eighth Amendment. The records in this case reveal that on April 4, 2017 Parker was a prisoner in state custody serving a revocation sentence with additional pending charges.

Federal courts have indicated that the higher constitutional standard governing convicted prisoners (i.e., the Eighth Amendment) applies where a plaintiff was returned to state custody upon a finding that he violated the terms of his probation. *See Smith v. Dickman*, 2013 WL 6175826, at *2 (W.D. Wis. Nov. 25, 2013) (indicating that, because plaintiff was in custody but still "pending

the revocation of his supervised release," the lower constitutional standard governing pretrial detainees applied); *Brown v. Harris*, 240 F.3d 383, 388, 2001 WL 133203 (4th Cir. 2001) (explaining that the higher constitutional standard governing convicted prisoners would have applied if there had been a finding that plaintiff violated the terms of his probation and was returned to state custody).

However, for the reasons stated below, the officers are entitled to dismissal under either standard.

**a. Parker's Claims Should Be Dismissed Under The Eighth Amendment As A Matter Of Law**.

The Eighth Amendment to the United States Constitution prohibits "unnecessary and wanton infliction of pain." *Lewis v. McLean*, 864 F.3d 556, 562 (7th Cir. 2017). It protects inmates from conditions that cause "the wanton and unnecessary infliction of pain, including both hazardous prison conditions, and grossly inadequate medical care." *Pyles v. Fahim*, 771 F.3d 403, 408-09 (7th Cir. 2014). "The burden is on the prisoner to demonstrate that prison officials violated the Eighth Amendment, and that burden is a heavy one." *Id.* To establish an Eighth Amendment violation stemming from inadequate medical care, a plaintiff must prove that jail officials acted with "deliberate indifference to serious medical needs." *Id.* A claim of deliberate indifference contains both an *objective* and a *subjective* component. *Id.*

To satisfy the *objective* component, a plaintiff must prove that his medical condition is objectively, sufficiently, serious. *Id.* at 563. A medical need is sufficiently serious if the inmate's condition "has been diagnosed by a physician as mandating treatment or … is so obvious that even a lay person would perceive the need for a doctor's attention." *Greeno v. Daley*, 414 F.3d 645, 653 (7th Cir. 2005). Serious medical needs are not restricted to physical conditions; the need for a mental illness to be treated may be considered a serious medical need if it could result in

significant injury, such as death by suicide, or the unnecessary and wanton infliction of pain. *Sanville v. McCaughtry*, 266 F.3d 724, 734 (7th Cir. 2001).

To satisfy the *subjective* component, a plaintiff must prove that jail officials acted with a sufficiently culpable state of mind; that is, jail officials must have known about, and must have disregarded, an excessive risk of harm to the inmate. *Lewis v. McLean*, 864 F.3d at 563.

Jail officials and staff are generally entitled to rely on the judgment of medical professionals because the question of whether or when a particular treatment is warranted is a "classic example of a matter for medical judgment." *Heard v. Sheahan*, 148 F. App'x 539, 540–41 (7th Cir. 2005). In other words, jail officials "who are not part of the medical team have acted appropriately if they have referred the issue to medical staff who could be expected to address it." *Diaz v. Godinez*, 693 Fed. Appx. 440, 444 (7th Cir. 2017) ("Diaz's grievance was forwarded to [medical staff], so there's no basis for his contention that these administrators disregarded his need for medical care.").

### i. Parker Did Not Suffer An Objectively, Sufficiently Serious Condition.

As to the objective standard, Parker has not alleged facts that his condition was objectively, sufficiently serious. *Lewis v. McLean*, 864 F.3d 556, 563 (7th Cir. 2017.) A medical need is sufficiently serious if the inmate's condition "has been diagnosed by a physician as mandating treatment or … is so obvious that even a lay person would perceive the need for a doctor's attention." *Greeno v. Daley*, 414 F.3d 645, 653 (7th Cir. 2005).

But Parker's complaints here were of itching and/or possibly a rash and thus did not rise to the level of an objectively sufficiently serious condition. At no point in time while at the Kenosha County Pre-Trial Facility was Parker diagnosed with any condition that mandated treatment or that was so obvious even a lay person would perceive the need for doctor's attention.

16

Additionally, to recover damages under §1983, "a plaintiff must show both injury and a 'casual connection between that injury and the deprivation of a constitutionally protected right." *Maus v. Murphy*, 29 Fed. Appx. 365, 369 (7th Cir. 2002) *quoting Henderson v. Sheahan*, 196 F.3d 839, 848 (7th Cir. 1999).

Here, Parker has shown neither injury or causation. As set forth in the factual background above, Parker's complaints were of itching, he received appropriate medical care while at the Kenosha County Pre-Trial Facility, and he was never diagnosed with any medical condition mandating treatment nor was his condition so obvious that even a lay person would perceive the need for a doctor's attention. Nor is there any evidence – expert or otherwise – to support an argument that Parker's lack of medical care caused him any injury.

### ii. The Officers Did Not Act With Deliberate Indifference.

Jail "officials who are not part of the medical team have acted appropriately if they have referred the issue to medical staff who could be expected to address it." *See Diaz v. Godinez*, 693 Fed. Appx. 440 (7th Cir. 2017); *Arnett c. Webster*, 658 F.3d 742, 755 (7th Cir. 2011); *Wilkins v. Wahl*, 563 Fed. Appx. 495, 496 (7th Cir. 2014) ("Thomas scheduled Wilkins for a physical exam, so the evidence does not suggest that he recklessly disregarded Wilkin's report of a back injury."). Furthermore, when an inmate is under the care of a jail's medical professionals, a non-medical jail official "will generally be justified in believing that the prisoner is in capable hands." *Arnett v. Webster*, 658 F.3d 742, 755 (7th Cir. 2011). "A layperson's failure to tell the medical staff how to do its job cannot be called deliberate indifference; it is just a form of failing to provide a gratuitous rescue service." *Burks v. Raemisch*, 555 F.3d 592, 596 (7th Cir. 2009).

That non-medical prison officials may defer to a jail's medical professionals stems from the recognition that correctional institutions engage in a division of labor. *Miranda v. Cnty. of*

*Lake*, 900 F.3d 335, 343 (7th Cir. 2018). "When detainees are under the care of medical experts, non-medical jail staff may generally trust the professionals to provide appropriate medical attention." *Id*. Under this standard, liability is possible only when jail officials had reason to know that medical staff were failing to treat or inadequately treating an inmate. *King v. Kramer*, 680 F.3d 1013, 1018 (7th Cir. 2012).

Here, there is no evidence to suggest that the named jail officials treated Parker with deliberate indifference but the evidence instead shows repeated and consistent medical care. Parker cannot even recall if he complained to Officers Martini or Shelby about his need for medical care, thus he cannot show that they had knowledge of his conditions. Without knowledge of such complaints, neither Officer Martini nor Officer Shelby can be said to have acted with deliberate indifference. *See Mitchell v. Richter*, 2017 WL 752162, *12 (E.D. Wis. Feb. 27, 2017) (finding that where a plaintiff fails to submit forms for requests for care, there can be no deliberate indifference).

Moreover, Parker alleges that he complained of itching only once to Officers Holterman and Knecht and that he cannot recall how they responded. Officer Knecht recalls telling Parker that he needed to fill out a medical request form. Parker was seen by medical *the very next day* – after using the jail's proper channels to request nonemergency medical care.

That Officer Knecht told Parker that he could not go to medical simply because Parker alleged his family called the jail is – as Parker admits – consistent with jail policy, which required Parker to submit a medical request form to receive medical treatment. Indeed, Parker submitted a medical request form that same day – April 4, 2017 – and was seen by medical staff for his itchy skin the very next day. At that appointment, medical staff suggested to him that Parker may be allergic to the laundry detergent.

In this instance, the named defendants – who are not trained medical staff - merely followed the proper procedures for an inmate complaining of a nonemergency medical need at the Kenosha County Pre-Trial Facility. As admitted by Parker, reporting that an outside family member contacted the jail is not the proper way to receive medical treatment. Instead, Parker was required to file a medical request slip – and he received prompt medical care immediately and repeatedly after doing so.

Finally, the circumstances in this case do not support a finding that the officers turned a blind eye to obvious incompetence on the part of the nursing staff. *See Rice ex rel. Rice v. Corr. Med. Servs.*, 675 F.3d 650, 678–79 (7th Cir. 2012) (jailers who knew of inmate's repeated complaints could rely on expertise of medical staff as to appropriate care because there was no evidence that jailers should have questioned those professionals, especially where medical personnel had access to medical records that jailers were forbidden from viewing under federal law).

This is not a case where Parker exhibited extreme and debilitating physical conditions that should have alerted the officers of an obvious need for emergency care. The decision to treat Parker's complaint of – what was at the time only an itch – as nonemergency and thus subject to the jail's normal medical request procedures – does not amount to deliberate indifference. See e.g. *Hicks v. Young*, 2011 WL 5507379 (N.D. Ill., Nov. 9, 2011) (An itchy rash or skin irritation, while understandably exasperating to live with, was not so objectively serious that Warden McCann can be faulted for requiring Plaintiff to follow proper channels.")

Accordingly, because Parker cannot prove that the any of the officers acted with deliberate indifference, Parker's Complaint should be dismissed in its entirety.

**b. Parker's Claims Should Be Dismissed Under The Fourteenth Amendment As A Matter Of Law.**

Recently, the Seventh Circuit extended the pretrial detainee objective analysis for excessive force claims to medical claims. *Miranda v. County of Lake*, 900 F.3d 335 (7th Cir. 2018); *Kingsley v. Hendrickson*, 135 S.Ct. 2466 (2015). Under the objective standard, a plaintiff need not show that the defendant was aware that his or her conduct was objectively unreasonable. *Miranda*, 900 F.3d at 353-354. The appropriate question is whether the defendants acted "purposefully, knowingly, or perhaps even recklessly" and "the defendant's conduct was objectively unreasonable." *Id*. This is still a higher standard than negligence or even gross negligence and is "akin to reckless disregard." *Id*. at 353.

For the same reasons discussed above, Parker's claims must fail under a Fourteenth Amendment analysis. Parker cannot recall whether Officers Martini or Shelby were even aware of his need for medical care. He cannot recall if he spoke with them directly, nor does he allege facts sufficient to show that Officers Martini and Shelby should have been aware of his need for medical care.

Moreover, Parker's complained only once to Officers Holterman and Knecht that he was itching. It is not objectively unreasonable for these officers to require Parker to proceed with his request of nonemergency medical care through the normal polices and procedures at the Pre-Trial Facility. Parker has not alleged any facts that Officers Holterman and Knecht should have known that he needed immediate medical care.

Indeed, a nurse came through the cellblock and did not recognize a need for Parker to have immediate medical care. If even a trained medical professional did not recognize Parker's conditions as needing immediate medical care, it cannot be said that it was objectively unreasonable for non-medical jail staff to come to the same conclusion. As non-medical personnel

they were further entitled to defer to the expertise of the medical staff, including those who had treated / were treating Parker for his itch and the nurse who came through at medpass. *Miranda v. Cnty. of Lake*, 900 F.3d 335, 343 (7th Cir. 2018).

Accordingly, because Parker cannot prove that the any of the officers acted objectively unreasonable, Parker's Complaint should be dismissed in its entirety.

## IV. THE CORRECTIONAL OFFICERS ARE PROTECTED BY QUALIFIED IMMUNITY.

Finally, the officers are shielded by qualified immunity. Governmental officials performing discretionary functions are shielded from liability insofar as their conduct does not violate any clearly established constitutional rights of which a reasonable person would have known. *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1992); *Hinnen v. Kelly*, 992 F.2d 140, 142 (7th Cir. 1993). An official is entitled to immunity if, when he acted, "he reasonably could have believed that his action did not violate a clearly established law." *Cham v. Wodnick*, 123 F.3d 1005, 1008 (7th Cir. 1997), *cert denied*, 522 U.S. 1117 (1998). "Put simply, qualified immunity protects 'all but the plainly incompetent or those who knowingly violate the law.'" *Mullenix v. Luna*, 136 S. Ct. 305, 308 (2015) (quoting *Malley v. Briggs*, 475 U.S. 335, 341 (1986)). Once raised by the defendant, the plaintiff bears the burden of defeating a defense of qualified immunity. *Weinmann, v. McClone*, 787 F.3d 444, 450 (7th Cir. 2015.)

It is Parker's burden to prove that his constitutional rights were violated, *and* that such constitutional rights were clearly established at the time of the alleged deprivation. *See Saucier v. Katz*, 533 U.S. 194, 201 (2001). This is a significant hurdle to overcome because qualified immunity is designed to shield from civil liability "all but the plainly incompetent or those who knowingly violate the law." *Stanton v. Sims*, 134 S.Ct. 3, 5-7 (2013).

In *Hunter v. Bryant*, the United States Supreme Court stressed the importance of resolving immunity questions at the earliest possible stage of litigation. 502 U.S. 224, 227 (1991). The Court reversed the Ninth Circuit's denial of summary judgment, holding that:

> The court of appeals' confusion is evident from its statement that '[w]hether a reasonable officer could have believed he had probable cause is a question for the trier of fact, and summary judgment … based on lack of probable cause is proper only if there is only one reasonable conclusion a jury could reach.' This statement of law is wrong for two reasons. First, it routinely places the question of immunity in the hands of the jury. Immunity ordinarily should be decided by the court long before trial. Second, the court should ask whether the agents acted reasonably under settled law in the circumstances, not whether another reasonable, or more reasonable, interpretation of the events can be constructed five years after the fact.

*Id.* at 227-28.

The principle behind the doctrine is that if the law at the time was not clearly established, an official could not reasonably be expected to anticipate subsequent legal developments, nor could he fairly be said to know that the law forbade conduct not previously identified as unlawful. *Id.* Therefore, regardless of whether a right was violated, "a defendant cannot be said to have violated a clearly established right unless the right's contours were sufficiently definite that any reasonable official in the defendant's shoes would have understood that he was violating it." *Plumhoff v. Rickard*, 134 S.Ct. 2012, 2023 (2014). "'[E]xisting precedent must have placed the statutory or constitutional question' confronted by the official beyond debate." *Id.* "[I]f judges thus disagree on a constitutional question, it is unfair to subject police to money damages for picking the losing side of the controversy." *Pearson v. Callahan*, 555 U.S. 223, 245 (2009).

"Clearly established law" at the time of the incident cannot be shown with "high levels of generality." *Plumhoff*, 134 S.Ct. at 2023; *Reichie*, 132 S.Ct. at 2093-94. It must instead be shown by presenting "controlling authority" or "a robust consensus of cases of persuasive authority" as of the date of the incident in question. *Plumhoff*, 134 S.Ct. at 2023; *Wood v. Moss*, 134 S.Ct. 2056,

22

2067 (2014) (deciding in part that a constitutional right not clearly established without previous case law); *Stanton*, 134 S.Ct. at 5-7 (reversing in favor of qualified immunity where prior case law "did not lay down a categorical rule for all cases" involving Fourth Amendment issue at stake, where Ninth Circuit read earlier precedent "too broadly," and where "[i]t is especially troubling that the Ninth Circuit would conclude that Stanton was plainly incompetent — and subject to personal liability for damages — based on actions that were lawful according to courts in the jurisdiction where he acted.").

For the reasons explained above, Parker cannot prove an underlying constitutional violation. Parker is unable to show that Officers Martini and Shelby even had knowledge that he was seeking medical treatment. Moreover, Officers Knecht and Holterman followed proper protocol for an inmate seeking non-emergency medical care. Parker filed a medical request slip and was seen by medical staff the following day. Accordingly, Parker cannot overcome the first prong of qualified immunity.

Nor can Parker overcome the second prong of qualified immunity – he cannot provide a robust consensus of persuasive and settled authority holding that the correctional officers can be found liable for deliberate indifference under the Eighth Amendment based on the particularized circumstances in this case.

There is no clearly established law finding non-medical jail officials deliberately indifferent under the following circumstances: when the inmate verbally requested once to be seen by medical for a nonemergency condition such as itching, when the jail had in place a procedure for an inmate seeking nonemergency medical care, and when the inmate was seen by medical staff the following day and otherwise seen repeatedly by medical staff. As explained by the cases cited above, such circumstances support a finding that the correctional officers were entitled to rely on

the Kenosha County Pre-Trial Facility's policies and procedures for medical requests and on the nursing staff's medical judgment.

## **CONCLUSION**

For the reasons explained above, COs Knecht, Shelby, Martini, and Holterman respectfully ask the court to dismiss Plaintiff Parker's Complaint in its entirety.


Dated this 1st day of November, 2018.

**MUNICIPAL LAW & LITIGATION GROUP, S.C.**

Attorneys for Defendants, C.O. Knecht, C.O. Shelby, C.O. Martini and C.O. Holterman


By:___s/ Samantha R. Schmid_____
      REMZY D. BITAR
      State Bar No: 1038340
      SAMANTHA R. SCHMID
      State Bar No. 1096315

P.O. ADDRESS:
720 N. East Avenue
Waukesha, WI 53186
O: (262) 548-1340
F: (262) 548-9211
E: rbitar@ammr.net
sschmid@ammr.net